Alright, the next matter on calendar is Pacific Premier Bancorp, Pacific Premium Bank v. Columbia Casualty Company, case number 24-7833, and each side has 20 minutes in this case. Thank you. Good morning.  With the Court's permission, I'd like to reserve six minutes for rebuttal. And do you want to tell us your name? My name, I am Harry Schultz, representing Appellant Pacific Premier Bank. Thank you. And how much time did you want to reserve? Six minutes, please. Six minutes? Okay, thank you. This case is an insurance coverage case arising from a series of underlying litigations alleging a Ponzi scheme. In those litigations, the claimants alleged that the managers of the investment pools siphoned money from the pool investment accounts to improper purposes. It was alleged that the Ponzi scheme lasted for over a decade, finally ending in 2019. The accounts were held by various banks, including Appellant Pacific Premier Bank, or PPB, in the later stages of the scheme. The claimants alleged, among other things, that PPB mismanaged pool investment accounts because they knew or should have known that the fund managers' improper transfers and that PPB should have stopped those transfers. Of course, this is not the only misconduct that was alleged by the claimants against the banks, including PPB. So I would like to ask you about what I think what I'm reading as concessions that you made regarding lending conduct. Your briefs repeatedly concede that you are not only requesting coverage for non-lending conduct. As one example on page 15 to 16 of your reply brief, you state, PPB is certainly not seeking coverage for lending activity, but for its own non-lending conduct. So if you are not claiming coverage for lending conduct, why does it matter whether the policy's lending exclusions are enforceable? Either way, we should be focused on PPB's non-lending conduct, right? Correct, Your Honor. Certainly, we believe that the focus should be on PPB's non-lending conduct. The reason why it's important here is, and part of the reason we're not seeking coverage for the lending conduct, that lending conduct all took place prior to PPB acquiring Grand Point Bank. That lending conduct was all by PPB's predecessors, Grand Point and Regents. It was all issued prior to PPB coming on scene. It was all paid off prior to PPB acquiring Grand Point. So, PPB's conduct is relegated to the alleged account mismanagement that occurred in the plan. But why do you concede that PPB did not participate in lending conduct when the second amended complaint in the Anderson litigation states that the bank renewed Miles' line of credit in December 2018, which would have been after the June 2018 merger? Because I don't believe that that alleged line of credit actually gave rise to any damages, nor was it the focus of the claim. So, what is the focus of the non-lending claim? So, this claim, the focus of this claim, it's a Ponzi scheme, right? So, basically you had investors who invested funds in the pool accounts. Those pool accounts were held by banks. Pacific Premier was one of those banks. And the account managers siphoned off funds to improper purposes. Some of them for their own personal purposes, allegedly. Some of them for sustaining the pools so that the Ponzi scheme could continue. Eventually, that Ponzi scheme gave rise to attempts to conceal the Ponzi scheme itself. And they did that through loans, right? The account managers obtained loans through various banks, including Grand Point and Regents, to help conceal that Ponzi scheme. But ultimately, the focus is, of the underlying claims, is a Ponzi scheme. Well, I'm talking about what is the non-lending, alleged non-lending activity of PPB that the loss that they suffered for which you're seeking coverage? Yes, Your Honor. So, the pool investors, all their money, all the investors' money were held in pool accounts. Those pool accounts were held at the banks. And then money was allegedly taken out of those accounts and diverted to improper purposes by the fund managers. So, some of it allegedly, my recollection from the underlying record, is it went to pay off lawnmowers and gardeners and vacations and things like that of the account managers. Some of it – Now, did that happen before you took over the other banks? It allegedly continued all the way through 2019, Your Honor. The Ponzi scheme continued after. And that's the non-lending activity? And that is the non-lending activity of PPB. And how much is that valued at? Don't know the answer to that, Your Honor, because the underlying case resolved prior to any adjudication or conclusive finding of fact as to whether the damages were actually – whether PPB was actually liable for the damages. But there's a $2 million retention, right? Yes, Your Honor. And so how could defense and settlement costs related to PPB non-lending conduct exceed $2 million retention in the policy? It seems to me that PPB's non-lending conduct only amounts to about, what I see in the record, $168,000 in loans to AEI-related parties. Yes, Your Honor. So, a couple of reasons for that. One is that the policy doesn't cover damages per se. It's not limited to covering damages. It more broadly covers loss.  And loss includes settlement payments. Loss includes defense costs, among other things. Here, the defense costs were $7 million before the case was settled. And the settled – Do you concede that the amount of loss from the loan is $168,000? $168,000? No, Your Honor. $100,000, sorry. That was among the evidence that was provided and to which my friend on the other side cites, too, as being damaged. And we're grateful for that because it's an admission that there was, in fact, at least some quantum of alleged damages. What is your estimate of the damage? I don't have one, Your Honor. Well, so what are we supposed to do? So, Your Honor, the – If it's not in the record, I see the $168,000. So are you saying, well, since we didn't put anything in the record, now let's send it back in a remand and we get a second go? No, Your Honor. So, again, the coverage here is for the settlement. And here, in particular, it's the unpaid settlement amount. So it's $1.5 million of a $9.5 million settlement. Our predecessors are paid. If the only covered loss for the nonlending conduct is $168,000, how can we attribute that to it? Your Honor, that's damages, and that's allocated damages alleged by the underlying claimant. No way that – you're suggesting that $7 million was the damages on $168,000 of lending? No, Your Honor, because there are other bases for liability. There was additional alleged conduct. There was additional alleged damages. It just didn't get developed in the underlying record because, again, the case settled before you got to that point. And more importantly, the underlying case also alleged joint several liability of PPB. So PPB, if it's found liable for, say, the $168,000, could have been held liable for the entirety of the conduct on joint several liability basis. And on that basis then would have had a massive loss. Even if your conduct only amounted to $168,000, but being jointly and several liable for the $7 million, that would have been covered by the retention? Yes, Your Honor. Assuming for the sake of argument that we were only found to have caused damages in the amount of $168,000, that liability could have translated into joint several liability for a far larger sum. If, in fact, it was not. Okay, I'm looking back at you state in your brief that PPB's nonlending conduct involves three allegations. One, improperly permitting related party loans. Two, failing to supervise employees providing those services. Three, failing to disclose improper commingling and transfers out of the pool accounts. But it seems to me that all of those allegations are related to the same conduct. So do you have any evidence that the underlying litigation alleged nonlending conduct by PPB other than the three related party loans amounting to $168,104? Your Honor, in our briefing we did cite to various allegations in the different complaints as to the alleged nonlending conduct. And, again, this is ultimately a Ponzi scheme, so that is the primary method or mechanism by which investors are harmed. Investors aren't harmed by monies coming into an account from informal loans. They're harmed by the improper siphoning of funds away from their investments, right? And that's what we're alleging, that the underlying plaintiffs allege that PPB knew or should have known that that was occurring and stopped it and didn't. And that that was the primary mechanism of the underlying claim. Even after you took over the bank? After we took over the accounts, Your Honor. You took over the accounts, I'm sorry. Yes. So let me see. You just said the underlying case is settled. Yes, Your Honor. And PPB contributed to that settlement? Pacific Premier Bank itself settled for $9.5 million. Eight million of that was paid by the predecessor's insurer, Zurich. The remaining 1.5 was paid out of pocket by Pacific Premier. And that's what you're seeking? That plus the $7 million of defense costs, Your Honor. $7 million in defense costs. And there were other settlements. All the cases settled. The accountant settled. The other banks settled. The investment managers also settled. There were no findings of fact, no findings of liability, no findings of wrongdoing on the part of anyone here. So that's part of the problem is we're dealing with a record where the underlying record, the case, settles. So it's difficult for us to say conclusively Pacific Premier did this or did that. Certainly those were the allegations. So what was the legal error that the district court made? The district court erred by granting summary judgment on the basis of the lending exclusions. And there were three errors with that. One is that the court completely absolved Columbia of having issued a policy which had three, not one, but three separate versions of the Lending Act of Exclusion that conflicted with one another. And so by reading, just interpreting one at a time, it basically excused the insurer from having to issue a clear, plain, and conspicuous exclusion to be interpreted by a layperson. The bank would have had to decipher this policy. Okay, that's one error. That's one error. Error two is that it fails to account for the non-lending conduct, which was separate from any lending conduct. The lending exclusions apply to lending acts committed by Pacific Premier. And in this case, Pacific Premier didn't commit any, but there was separate non-lending conduct that it did commit and for which it could have been held liable. Pacific Premier had this matter gone to trial. Certainly, Pacific Premier could have been found liable for the non-lending conduct that it allegedly engaged in, while its predecessors could have been found not liable for any lending acts that they engaged in. And then lastly, the court ignored the phrase, that part of loss. The exclusion only applies to that part of loss. And that basically says that if you have a mixed situation where you have covered and non-covered claims, then only that part of the loss that is excluded would be covered. So basically, it throws you into an allocation situation, and the policy has an allocation provision to deal with that. But that part of loss very clearly indicates that the policy was intended to have very narrow exclusion, and the court should interpret this exclusion narrowly. The underlying court failed to do so. So, but I think we can affirm on any ground, right, if we feel that there's a – I mean, the law basically allows us to affirm on any ground. Let's say we agree that PPP is able to establish an allegation in the underlying litigation that would be covered by the policy. But on this record, PPP provides no reason to believe that its part of loss associated with the allegation would exceed the policy's $2 million retention. So can't we affirm on that basis? No, Your Honor. With all respect, you're conflating damages with loss. The policy covers loss. The loss is the $1.5 million of unpaid settlement and the $7 million of defense costs. That is what the policy covers. It doesn't cover liability per se. It's not limited to damages. It's not limited to liability. It covers loss. So you can have a situation. But you're attributing the whole $7 million to the nonlending conduct and defense costs? Yes, Your Honor. That was unpaid, Your Honor. Is that reasonable? I mean, there's no allocation between lending – because you were defending on both grounds, right? Because you were as ex-assessor, correct? Yes, Your Honor. And so you could get into a lending or an allocation issue there. Right. You're asking us to put all the $7 million to the nonlending conduct. And that's a question still to be determined, but we would argue that under – Sorry, what do you mean by that? What would be the proper allocation of the $7 million. Yeah, so that has never been determined by – It has not been determined yet, Your Honor. Would that put an issue? It was. Our motion specifically that we filed, we filed cross motions. Our motion sought a determination on the allocation questions, Your Honor. So could we remand on that question? Yes, Your Honor. Because that would help us decide whether or not you meet the $2 million retention, right? It could, Your Honor. It could. Because I just don't think it's fair that you say the whole $7 million should be attributed to the nonlending conduct. So under Ninth Circuit precedent, Your Honor, specifically – I'm trying to remember the case from my briefing. The Ninth Circuit adheres to the reasonably related test. Right. It seems odd that the $168,000 in loss would lead to $7 million in defense costs. Your Honor, the same depositions were needed, the same appearances, the same motion practice was needed. So our argument would be is that it was all inextricably intertwined with the defense, and so it couldn't be parsed out. But certainly that allocation question is one that the district court did not get to. Okay. And then, Your Honor – Do you want to save any time for rebuttal? Yes, Your Honor, I'll save time for rebuttal. Let's see what your friend on the other side has to say about all of this. All right. Thank you. May it please the Court, Travis Wall for Continental Casualty – I mean Columbia Casualty Insurance Company. Basically, counsel made a lot of concessions during his oral argument there that shows that there is no potential for coverage. The first is, as the court understands, this Ponzi scheme was essentially done before the merger. You had the merger in 2019, and before then, all these loans had been done and had been paid off. And the only allegation are these residual allegations about the use of these three deposit accounts that somehow tie back. And the point is, and the court correctly held, that there would be – there's no liability for the bank because all of the potential liability arises out of or is based upon the previous loan activity, which is excluded under Endorsement 16. There's no way, and counsel hasn't shown, how the residual use of these three deposit accounts, how the bank would be liable for that if you hadn't had the prior loan activity. If you hadn't had the prior loan activity, under Washington law, the bank wouldn't be liable for the misuse of the funds because there would be no prior abetting breach of fiduciary duty to make the bank liable for that. And the counsel admitted that everything is inextricably intertwined, and he's also argued that joint and several for all damages, ranging back to the beginning of the Ponzi scheme and these loans. And that just proves and shows that all the damages being alleged in the case arise out of or are based upon excluded loan activity. Without that, there would be no liability, and the court correctly found that. Now, I don't agree with him about joint and several. I don't think if the bank were just being sued for its post-merger activity, it would only be liable – joint and several liable for the damages it caused going forward, not everything that happened before. In the complaints in the underlying litigation, were there any allegations about non-lending activity by PPB? There were allegations about the use of the deposit accounts, and there was some dispute about that. But – Why isn't that enough? Because – let's just assume for the sake of argument that the bank was sued only for the post-merger activity and the fact that it allowed these pool managers to misappropriate funds. The bank, under Washington law, doesn't have a duty. They're not a fiduciary. They have no duty to stop those misappropriations. The only basis to assume that they had a duty to stop it was because of the bank's knowledge from its previous loan activity that they were misappropriating funds. So even though that's allegedly non-loan activity, it still is based upon or arises out of excluding lending activity. It's based upon or arises out of liability assumed by contract. It sounds like there's potential for coverage there. It's – I'd like to hear Kams articulate the theory in which the bank could be held liable for allowing these related party loans if it's assumed that they didn't have actual knowledge that the pool managers were misappropriating funds, if there hadn't already been an assumption that they were aiding and abetting on a breach of fiduciary duty. There's no way that they would be held liable for that. So you're saying that there's no coverage for anything, non-lending or lending conduct here? Correct, because even the, quote, non-lending conduct wouldn't be liable or it's based upon or arises out of excluded activity. Now, but even if you – Yeah, if we disagree with that part that the insurance is liable, there should be coverage for at least the non-lending activity. I mean another argument that we make, and it's this – the only way that the bank could be liable is if they had actual knowledge that they were breaching fiduciary duties and provided substantial assistance for it in the post-merger period. And that's not covered under 533. That's uninsurable conduct. And they're going to argue that they should have – at that point, there was just a failure to act, and you could be liable just for failure to act. But under the Armstrong cases and others that we have cited, a bank could only be liable for failure to act if they had actual knowledge that there was wrongdoing and had a conscious and reckless disregard of a duty to act. And that's not insurable conduct under 533. So it either arises out of or relates to excluded activity. It's excluded on that basis. Or to be able to prove it, you have to show conduct that rises to the level of uninsurable conduct under 533. Now – Wait. Can you show – how is it related to – I mean it's just bank accounts, right? Just administration bank accounts, money going in and out? Right. So they're taking money out of the bank accounts, true. Yeah, but how does that relate to a lending activity? It relates to it because the bank – the only reason the bank has a duty to stop that is because of its aiding and abetting loan activity before. That's how – it's based upon or arises out of that prior activity. Was there an allegation in the underlying complaints that when PPB took over the other banks, it knew of the Ponzi scheme? There's no allegation, I think, that the bank – it's a separate bank. You knew about it. But through the merger, the people that committed the alleged wrongdoing are now part of the bank. So they had that knowledge. And so because they were there, they should have stopped it. But our point is that if you assume a duty to stop it, you have to arise – it has to rise to the level of uninsurable conduct under 533. Or it's related to – causally related to the previous conduct. But administering an account would not be considered lending conduct, right? You're saying the lending conduct is just the knowledge part, not the actual conduct? Right. There would be no duty on the part of the bank to stop them from misappropriating funds or these related party loans, but for the fact that they had the knowledge due to their prior aiding and abetting activity. That's the connection. And it's either – That's pretty broad. That's a pretty broad reading of that. But even if you get through these – jump through these hoops – and I want to briefly talk to you about the other two lawsuits, the BD and the Anderson ones. Those dealt with sales and securities, and that all happened before the merger. And the only alleged sales that they alleged during the merger period were supposedly the reinvestment of interest within a fund. But to be liable under these statutes, you have to not only know that it's a fraudulent sale but materially aid in it. And my point is that even if there were reinvestments of interest, the bank didn't do anything. That's just an internal accounting function in these pools. They're not taking money out of deposit accounts for that. So the bank can't be liable for those alleged post-merger sales. So there's no potential coverage. That's another grounds for those two securities lawsuits. Well, your answering brief does not engage with California's conspicuous plain and clear standard. Why is that? And what is your position on whether the lending exclusions are plain and clear to a layperson? We didn't – They seem pretty convoluted, if you ask me, or complicated. We did address the interpretation, and we argued that they were not contradictory and they were clear. So in that sense, the cases that they cite involve situations in which you have an exclusion buried in legalese, and the court says that's not conspicuous and it's not covered. Well, I guess your brief indicates that if a loss is related to an extension of credit, then Endorsement 6 applies. But the term extension of credit is also found in Exclusion 16 and Endorsement 15. Is that extension of credit language superfluous? Does it ever apply? So let me – so you have three exclusions that they pointed out. One is Exclusion 16 in the body, which is the first one, and it excludes any liability for extensions of credit, refuses to extend credit, but it has a carve-out for loan servicing. Then you have Endorsement 6 in which they provided coverage for loans. So the bank bought an endorsement so they could actually be provided coverage if they have loans. And that has its own exclusion, which is more narrow because it's related to that endorsement. And that exclusion applies only to the extent the claim implicates coverage under that endorsement. And then you've got 15, Endorsement 15, but all that did was add an extra prong about paycheck protection loans. They're really irrelevant to this case. So at the end of the day, you have two exclusions. You've got the one in the body, 16, and you've got Endorsement 6. And the one in Endorsement 6 states it applies if coverage implicates that endorsement, ensuring agreement in that endorsement, then the exclusion in Endorsement 6 applies. If coverage doesn't implicate that endorsement, then the exclusion in the body, 16, applies. It's very straightforward. It's not contradictory. And it's completely different than the cases they cite in which one in one case, the Virto case, in which you had two endorsements that altered the same exclusion, and one deleted it, and one just revised it, and it was contradictory, and the court said, we're going to pick the construction that's the most favorable of coverage. Well, so you suggest in your briefs that any conduct by PPB would be covered under the lending exclusions in the policy. But what about the bank allowing loans from the investment pools to parties related to AEI? That seems like it would not be lending conduct undertaken by PPB. How could that fall under the policy's exclusions? That conduct would not fall under Endorsement 6, which only covers liability relating to loans by the bank. So I agree with that. So the exclusion in the Endorsement 6 would not apply to that lending activity. The other one in 15, or in the body, 16, applies to any lending activity and says it's excluded and not covered. So what about the $2 million retention that we talked about? Right, and that was actually some of the main briefing below, and it's evolved over time. But one of our main arguments was that if you strip everything away, at the end of the day, there's a potential maybe $168,000 worth of damages. That's all that's in the record. And that $168,000, by the way, is not – and we objected to this. Those are just allegations, not actual findings of damages. But we put it in there. The allegations, the only ones that we could find, add up to $168,000. So our main argument was how can – if you assume that the bank was being sued, had been sued only for its handling of those three deposit accounts and $168,000, is there any conceivable basis that the defense and indemnity costs would go – rise over $2 million? And our answer is no. And also, they had the burden, under the Pan Pacific case, to bring forth evidence to show covered claims and the defense costs related to those claims. And in the briefing below, they put up no evidence about what claims were actually covered below and what damages were actually covered. They put no evidence in at all. All they did was cite allegations. So our point is they didn't meet their burden of proof initially. What about the $7 million in defense costs? Right. So then – see, this ties back to the argument that – our rising out of argument. How are we going to be – how can you argue that the entire $7 million relates to just $168,000 loans unless you assume it's all connected, it's all commingled, and therefore it all rises out of the same excluded conduct? Yeah, but there's no factual findings on that, right? Would you have to make some sort of assumption? There were no factual findings below that allocation because the court really did not address that particular issue. The district court couldn't have made factual findings because this was on a summary judgment, correct? It was on a summary judgment. So when you said that there was – in the briefing below, when this issue was raised in the briefing below, is that correct, the defense costs? $7 million retention? Yeah. Yes. Yes. And they offered nothing to the district court? No evidence to the district court about actual damages during the post-merger period.  All they put in was allegations. They alleged that there were certain damages, or they alleged that this funding happened without putting in actual evidence of the actual loss. And our point was – But was there any discussion or any debate about it being all intricate – the defense costs being intricate related to all the claims? Well, that's one reason why our argument evolved. Because our first – in our motion, we started with 533 applies and you can't get to the $2 million retention. And then they argued joint and several liability. Everything's connected. It's all connected, all causally connected. And we said, well, if that's true, then the Lending Act exclusion applies and the contract exclusion applies. And the court agreed. So they argued that everything was interconnected. They argued that it was all one connection and ties to each other. And that's enough for the arising out of language to apply under the context of this case. And under the Pan-Pacific case – I'm sorry. So your argument, because they're saying it's all intertwined, that just proves it's all arising out of – and so therefore the lending exclusions all apply. Right. If the bank is supposedly joint and several liable for everything just because of its conduct – Right. But then you have to then find that the lending exclusions were conspicuous, plain, and clear. I guess my problem is that the district court didn't seem to find it because the district court just said under this one, under that one, the district court didn't make a finding of which one actually applied. Right, because it didn't need to. Because the big debate before is, like, does this exclusion or this exception for loan servicing apply? How does that somehow apply to this case? And that was kind of the big fight below. And the court rightly pointed out that if you look at the one in Endorsement 6, it applies to any loan that's not originated from an insured entity, which only would mean the bank during the post-merger period. And because of that, none of it's covered. And the previous one says we don't cover any extensions of credit at all to anybody, but we have an exception for loan servicing. And our point was even if you recognize that exception, none of the activities that are being accused of during the post-merger period involve loan servicing. Well, but it's clearly conspicuous. It's conspicuous. You would think that the district court said, well, then clearly this exclusion applies, and under this exclusion it doesn't fit. Well, the parties were arguing about the different things, and the court didn't have to reach that conclusion because under either endorsement, either one applied. Yeah, but so under – I mean only one endorsement should apply here, right? One exclusion should apply here. Which one is it? Endorsement 16 in the body, I think, is the endorsement that applies here. Well, you think. I'm sorry. It's the endorsement that applies here. You think that it's clearly inconspicuous and plain that it's endorsement 16 and nothing else. Right. And the only endorsement, the one in the body, could apply to the one loan that the court pointed out in the $75,000 loan to the pool manager during the post-merger period. It could apply to that, but as counsel mentioned and conceded, that loan was at the end of the day didn't cause any damages and really didn't have any bearing on anything. And so the one endorsement 6 could apply to that, but I think under the facts of this case, the one in the exclusion endorsement 16 in the body applies, and it's broad enough to bar any liability relating to any sort of loans and any other damages that arise out of or based upon those loans. That would include all the damages alleged below. And just a few things about allocation. In the Pan Pacific case, the Ninth Circuit pointed out that when you have a policy like ours that covers its indemnity policy, you've got to show there's covered loss in the defense costs related to that. The burden is on the insured to prove coverage in the defense costs related to covered claims. They didn't do that. They didn't put the evidence in, and that's a separate basis for- What kind of evidence could they have submitted? They could have submitted evidence about actual related party loans to show that there were related party loans during the post-merger period and that that's potentially, they're liable for that, but they didn't. They just relied upon the allegations. I think they're asking to develop the record on their $2 million retention. Do you think they're asking for that? I think they are. Well, then we're going to have a dispute about burdens of the allocation and how that applies. The briefing and the appeal didn't deal with that in detail. So if the court is going to remand on that, I'd ask the court just to remand on it, and then they can deal with the briefing below. But because there is authority that when you have an allocation provision like the one in our case, it does require an allocation. It does require something. There are some allocation provisions in which the Ninth Circuit said you might just have to use your best efforts, but an allocation is not actually required. In this case, you have to have an allocation. In the Pan Pacific case, the burden is on the insurer to show that there is coverage and which claims relate to that. Now, they talk about the reasonably related test. There is authority that the reasonably related test doesn't apply under the context of this case. It's a district court opinion. It's an endurance case, 2011, WL5417103, in which the court was dealing with an allocation provision just like ours, and they didn't use a reasonably related test. Instead, the court just allocated based on the number of the parties and did a 30% allocation. In that case, if you did it that way under this case, there's no way you can get to the $2 million retention because the liability, all the damage has happened before the post-merger period. There's really nothing during the post-merger period. There's no basis. So, in front, I think the court can do it on the current record to say you're going to get over that $2 million retention. You just don't have enough evidence because there's, I think, if you just look at it as just kind of reasonably, if they were sued for just $168,000, they would not have incurred $7 million to defend that claim. I think that's a fair way of looking at it. He talks about the larger settlement rule, and I don't necessarily concede that that's the rule that applies, but it says where your damage is higher because of the uncovered claims. Well, yes, it would be higher because if you just had a $168,000 claim and all you're doing was defending that, there's no reasonable basis to believe you would spend $7 million or more than $2 million even to defend and settle that claim. Unless the court has further questions. I have nothing further to add. We don't appear to. Thank you. Thank you. Hello again. A few points to make up. First, with respect to the focus on damages, there's a lot of focus on whether PPP proved or had to prove that it actually caused damages to the underlying claims. The answer is absolutely not. It would be a strange policy that provided coverage against claims, including defense costs, and then you prevail on the claim. And then what, you don't have coverage at that point? No. The answer is no. The policy very clearly provides coverage for defense costs and other loss, including settlements. So if you settle a claim and don't have an underlying judgment, that settlement itself can also be covered without proving that there were underlying damages that were caused by the conduct allegedly committed by the insured. That then takes you into joint several liability, which my friend also talked about. Joint several liability here could have rendered Pacific Premier liable for a far greater sum than just the focus of the particular claims. Now, he mentioned or stated that he believed that that would then take you into the land of the exclusion, the lending exclusions, because it would have rised out of. And the answer to that is no, because the exclusions themselves are limited to excluding loss resulting from PPB's lending conduct. Pacific Premier didn't engage in any lending conduct. It's liability. But he's saying that your knowledge, the claim, even if it's nonlending conduct, that your knowledge that gives rise to the claim is based off of the lending conduct. And that's where we disagree, Your Honor. The conduct that gave rise to Pacific Premier's alleged liability here wasn't the loans. It was the account mismanagement. The account mismanagement is the Ponzi scheme. You can have a Ponzi scheme without loans. You can't have a Ponzi scheme without a Ponzi scheme, whereas funds are being siphoned. But I think he's saying that your duty to stop that money coming out of the fact that you had knowledge essentially that was the Ponzi scheme from the lending conduct. No, Your Honor. Well, that is what he said. The underlying claims allege that Pacific Premier and its predecessors had knowledge of these funds through the prospectuses as to what the proper purposes were for the funds and how they were supposed to be used or not used, as the case may be, and that that gave rise, that knowledge of those prospectuses, gave rise to a heightened level of knowledge that gave rise to a heightened duty under a breach of fiduciary duty claim. Well, I want to go back to the allocation. It appears that your client rejected a 9% allocation offer by Columbia. Why wasn't that a fair allocation offer? The Ponzi scheme lasted for over a decade, yet PPB's involvement only lasted for months, and during that time PPB did very little, if anything, to perpetuate the Ponzi scheme. A few reasons, Your Honor. First off, they proposed a 9% allocation, but they would also apply that to the retention, which would have converted the $2 million retention into a $22 million retention, effectively negating any coverage for PPB. Secondly, it's because the proposed allocation, we believe, was inconsistent with California, and more specifically Ninth Circuit law, on allocation provisions. You've got the larger settlement rule, pursuant to Safeway, as well as the reasonably related test, pursuant to Raychem. There's a plethora of jurisprudence from this court that basically give the benefit of allocation towards the insured and require the insurer, because it is a limiting provision, require the insurer to prove what that allocation is and the extent of any non-covered loss. Otherwise, you're essentially letting the insurer basically say, well, there's an exclusion, and therefore we don't have to provide coverage. And it's the insurer's burden to prove that non-coverage and the extent of that non-coverage, Your Honor. With respect to Pan Pacific, he cited that case and said that we did not, that that case required that we had to prove actual damages. That's not what that case says. The case, in fact, the underlying district court granted summary judgment on the basis that the insurers concluded that the underlying claim was only for non-covered restitutionary relief. And this court reversed that, saying that because some of the prior claims that had been dismissed could have been covered and could have influenced that settlement, and those claims could have theoretically been resurrected at some point, that that rendered the claim covered. So this court actually remanded it for coverage in favor of the insurer. Your time is up. Unless my colleagues have any additional questions, I'm going to ask you to wrap up. I have no further statements, Your Honor. Thank you. Okay, thank you both for your argument in this case. It stands submitted.
judges: PAEZ, CALLAHAN, BUMATAY